Justice Boyd delivered the opinion of the Court.
The question in this case is whether the Texas Public Utility Regulatory Act grants the Texas Public Utility Commission (the PUC) exclusive jurisdiction to resolve issues underlying a customer's claim that a PUC-regulated utility breached a contract by failing to timely provide electricity services. We hold that it does, so we reverse the court of appeals' judgment and render judgment dismissing this case without prejudice.
I.
Background
In 2007, Chaparral Energy, LLC, requested that Oncor Electric Delivery Co. provide electricity to two wells Chaparral had recently drilled in Loving County. Oncor agreed, although it would have to construct new facilities to deliver electricity from its existing facilities to a "tie-in" point from which Chaparral could construct facilities to transmit the electricity to the wells. Oncor allegedly represented that it could complete its work within about ninety days, possibly even sooner. In late September 2007, Oncor delivered a proposed written agreement (the Service Agreement) to Chaparral. The Service Agreement required Chaparral to pay $22,327 as its share of Oncor's costs to construct the new facilities. The agreement provided that "the start date of this project will be no earlier than two weeks preceding the execution of this agreement" and that Oncor would provide a "more definitive installation schedule" upon Chaparral's delivery of the executed agreement and required payment. Chaparral delivered the signed Service Agreement and *137 the $22,327 payment to Oncor by the end of November.
Oncor never provided Chaparral a "more definitive installation schedule." Several weeks later, when Chaparral inquired about the project's status, Oncor explained that it was having difficulty obtaining easements it needed to construct the new facilities across privately owned land. Chaparral alleges that these representations were false and that Oncor did not even attempt to obtain all of the necessary easements until several months later. In any event, Oncor did not obtain the easements until December 2008. According to Chaparral, Oncor then finished constructing the new facilities in two days. Meanwhile, Chaparral allegedly spent over $300,000 to rent generators and purchase diesel fuel to provide the necessary power to the wells.
Chaparral sued Oncor in district court for breach of contract, seeking actual damages, additional damages, interest, attorney's fees, expenses, taxable costs, "and any further legal or equitable relief to which Chaparral may be entitled." Chaparral alleged that "Oncor did not cooperate in good faith to fulfill its duties and obligations" under the Service Agreement, that "Oncor did not use reasonable diligence, nor did Oncor act in a manner consistent with good business practices, reliability, safety, and expedition," and that Oncor "engaged in intentional misconduct" and was grossly negligent.[1] It also specifically pleaded that all "conditions precedent to the causes of action asserted and the relief requested by Chaparral herein have occurred, have been performed or have been waived."
A jury found that Oncor failed to comply with the Service Agreement. Based on the jury's findings, the trial court awarded Chaparral $186,000 in actual damages, nearly $30,000 in prejudgment interest, $200,000 for attorney's fees, and taxable court costs. Oncor appealed. While the appeal was pending, the Fort Worth Court of Appeals issued its decision in Oncor Electric Delivery Company, LLC v. Giovanni Homes Corporation , 438 S.W.3d 644 (Tex. App.-Fort Worth 2014, pet. denied). There, the Fort Worth court decided sua sponte that the PUC had exclusive jurisdiction over Giovanni Homes's breach-of-contract claim against Oncor. Id. at 657. Oncor then moved to dismiss Chaparral's claim for want of jurisdiction, arguing for the first time that the PUC has exclusive jurisdiction to resolve Chaparral's allegations. The court of appeals denied Oncor's "jurisdictional challenge" and affirmed the trial court's judgment. Oncor Elec. Delivery Co. LLC v. Chaparral Energy, L.L.C. , 511 S.W.3d 750, 752 (Tex. App.-El Paso 2016). We granted Oncor's petition for review.
II.
Jurisdiction
Oncor argues that the court of appeals erred by denying Oncor's dismissal motion because the PUC has exclusive jurisdiction over Chaparral's claims. Chaparral disagrees, of course, and also argues that even if the PUC might otherwise have exclusive jurisdiction, Chaparral did not have to exhaust administrative remedies because (1) the PUC has no authority to resolve a breach-of-contract claim or award damages as a remedy for a breach, and (2) forcing Chaparral to pursue its claim before the PUC would deny Chaparral its constitutional rights to open courts and to a jury trial. We address each issue in turn.
*138 A. Exclusive jurisdiction
A state agency "has exclusive jurisdiction when the Legislature has granted that agency the sole authority to make an initial determination in a dispute." In re Entergy Corp. , 142 S.W.3d 316, 321 (Tex. 2004). When an agency has exclusive jurisdiction, courts lack jurisdiction until the party has exhausted all administrative remedies before the agency. Id. at 321-22. Because a challenge to the court's subject-matter jurisdiction cannot be waived, a party may raise exclusive jurisdiction for the first time on appeal. Rusk State Hosp. v. Black , 392 S.W.3d 88, 103 (Tex. 2012).
We begin with the presumption that district courts are constitutionally authorized to resolve legal disputes. Entergy , 142 S.W.3d at 322 ; see TEX. CONST. art. V, § 8. To overcome that presumption, the Constitution or another law must grant exclusive jurisdiction to another court or an administrative agency. In re Sw. Bell Tel. Co. , 235 S.W.3d 619, 624-25 (Tex. 2007) ; Entergy , 142 S.W.3d at 322. Unlike courts, an administrative agency is "a legislative creation with only those powers expressly conferred and necessary to accomplish its duties." Sw. Elec. Power Co. v. Grant , 73 S.W.3d 211, 216 (Tex. 2002). Whether an agency has exclusive jurisdiction presents a question of statutory interpretation we review de novo. Subaru of Am., Inc. v. David McDavid Nissan, Inc. , 84 S.W.3d 212, 222 (Tex. 2002).
A statute grants an agency exclusive jurisdiction when its "language clearly expresses the Legislature's intent for the [agency] to have exclusive jurisdiction over matters the [statute] governs." David McDavid Nissan , 84 S.W.3d at 223. Absent such an explicit grant, an agency may also have exclusive jurisdiction "when a pervasive regulatory scheme indicates that the Legislature intended for the regulatory process to be the exclusive means of remedying the problem to which the regulation is addressed." In re Sw. Bell Tel. , 235 S.W.3d at 624-25 (citing David McDavid Nissan , 84 S.W.3d at 221 ). In deciding whether a "pervasive regulatory scheme" exists, the statutory language is determinative. Entergy , 142 S.W.3d at 322-23.
Oncor is a public transmission-and-distribution utility regulated by the PUC. See Oncor Elec. Delivery Co. LLC v. Pub. Util. Comm'n , 507 S.W.3d 706, 709-10 (Tex. 2017). The Texas Public Utility Regulatory Act (PURA) grants the PUC broad powers to "regulate and supervise the business of each public utility within its jurisdiction and to do anything specifically designated or implied by [PURA] that is necessary and convenient to the exercise of that power and jurisdiction." TEX. UTIL. CODE § 14.001. PURA's express purpose "is to establish a comprehensive and adequate regulatory system for public utilities to assure rates, operations, and services that are just and reasonable to the consumers and to the utilities" and "to grant the [PUC] authority to make and enforce rules necessary to protect customers of ... electric services consistent with the public interest." Id. § 11.002(a), (c). It reiterates this purpose in Subtitle B, which governs electric utilities like Oncor. Id. § 31.001(a). It also provides that it "shall be construed liberally to promote the effectiveness and efficiency of regulation of public utilities." Id. § 11.008.
Oncor argues that PURA grants the PUC exclusive jurisdiction over Chaparral's claim both expressly and by creating a pervasive regulatory scheme. In support of an express grant, Oncor points to section 32.001, which grants the PUC "exclusive original jurisdiction over the rates, operations, and services of an electric utility." Id. § 32.001(a). We held in Entergy that this section "makes it clear that the *139 Legislature intended [Entergy's] dispute regarding utility rates, operations, and services to begin its journey toward resolution at the PUC." 142 S.W.3d at 323. The plaintiffs in that case alleged that by entering into a settlement agreement, Entergy breached an earlier merger agreement in which it had agreed to file a ratemaking proceeding and agreed that its customers would receive the benefits of "certain merger-related savings." Id. at 320. Relying on section 32.001, we held that PURA granted the PUC exclusive jurisdiction over that breach-of-contract claim, remarking that in "cases like this one, where the Legislature clearly expresses its intent through statutory language, our exclusive jurisdiction inquiry is uncomplicated." Id. at 323.
Oncor also relies on Entergy to argue that PURA's comprehensive regulatory scheme confirms that the PUC has exclusive jurisdiction over Chaparral's claims. We noted in Entergy that "the statutory description of PURA as 'comprehensive' demonstrates the Legislature's belief that PURA would comprehend all or virtually all pertinent considerations involving electric utilities operating in Texas." Id. "That is," we explained, "PURA is intended to serve as a 'pervasive regulatory scheme.' " Id.
Entergy does not necessarily end our analysis, however. All regulatory schemes have limitations. See, e.g. , Clint Indep. Sch. Dist. v. Marquez , 487 S.W.3d 538, 546 (Tex. 2016) (noting that the exhaustion-of-administrative-remedies requirement "applies only to complaints that the Legislature has authorized the Commissioner to resolve"). PURA undoubtedly grants the PUC exclusive jurisdiction, but we must determine whether Chaparral's claim falls within that jurisdictional scope. Asserting it does not, Chaparral distinguishes Entergy on the basis that the claim in that case arose under "very different circumstances." Specifically, Chaparral asserts that Entergy "was a traditional 'rate case,' ... a judicial proceeding to review rates fixed by the appropriate regulatory authority." According to Chaparral, the Entergy plaintiffs sought only to enforce the merger agreement, which "may have begun as a private contract" but later "took on an administrative character" when "the parties agreed that the merger savings would be implemented [in post-merger rate proceedings] filed with the PUC and requested that their agreement be placed in [a] PUC order." 142 S.W.3d at 323-24. Chaparral contends that its claim, by contrast, is simply for monetary damages resulting from the breach of a private contract that has never taken on "an administrative character." According to Chaparral, the PUC's exclusive jurisdiction does not extend to claims that seek monetary damages for breach of a private contract because such a claim "does not require administrative expertise, challenge Oncor's tariff, or usurp the PUC's regulatory role. It simply requires a jury to determine whether Oncor timely performed its contracted duties, and if not, to award damages."
We are not convinced. As we have noted, PURA expressly grants the PUC "exclusive original jurisdiction over the rates, operations, and services of an electric utility." TEX. UTIL. CODE § 32.001(a). PURA defines the term "service" to have "its broadest and most inclusive meaning." Id. § 11.003(19). "The term includes any act performed, anything supplied, and any facilities used or supplied by a public utility in the performance of the utility's duties ...." Id. (emphasis added). Although Chaparral's claim that Oncor breached the contract by delaying construction does not involve Oncor's rates, it does involve Oncor's "services," and PURA grants the *140 PUC exclusive jurisdiction over those services.
Two Texas courts of appeals have confronted this same issue. In City of Houston v. CenterPoint Energy Houston Electric, LLC , the City of Houston sued an electric utility for breach of contract, alleging that the utility had overcharged the City for streetlight services in violation of the utility's tariff. No. 01-11-00885-CV, 2012 WL 6644982 at *1 (Tex. App.-Houston [1st Dist.] Dec. 20, 2012, no pet.) (mem. op.). Like Chaparral, the City argued that the PUC did not have exclusive jurisdiction because the claim presented "a simple contract dispute between a retail customer and a utility." Id. The court of appeals rejected the City's argument, noting that the PUC "had the authority to approve the Tariff, and it is a natural extension of that authority for the agency to decide, as a regulatory matter, a dispute arising from the Tariff." Id. at *7. And as mentioned, the Fort Worth Court of Appeals held in Giovanni Homes that the PUC had exclusive jurisdiction over a retail customer's claim that Oncor breached the parties' contract by delaying its provision of electricity to the plaintiff's property. 438 S.W.3d at 657 ("When claims pertain to 'services' and 'rates' under the PURA, the PUC has exclusive original jurisdiction."). We agree with these courts' construction and application of the scope of PURA's grant of exclusive jurisdiction to the PUC. Chaparral's complaints arise from Oncor's alleged breach of the Service Agreement, in which Oncor agreed to "provide additional electric facilities sufficient to provide electric service" for Chaparral's wells. Thus, Oncor's provision of "services" is integral to the parties' agreement.
Chaparral argues, however, that in addition to section 32.001, we must also consider PURA's section 17.157, which provides that the PUC "may resolve disputes between a retail customer and a billing utility, service provider, telecommunications utility, retail electric provider, or electric utility." TEX. UTIL. CODE § 17.157(a) (emphasis added). This section also requires the PUC to "adopt procedures for the resolution of disputes in a timely manner" and authorizes the PUC to "investigate an alleged violation" and to resolve such disputes by awarding a variety of relief. Id. § 32.001(b), (c). Chaparral argues that, by using the permissive term "may," this section demonstrates that PURA grants the PUC only "limited permissive, concurrent jurisdiction" with district courts. The court of appeals agreed, holding that "the PUC's power to resolve individual utility customer disputes, which is discretionary, arises from Section 17.157," not section 32.001, and section 17.157's "discretionary language does not clearly and expressly grant the PUC sole authority to make an initial determination in the instant dispute." 511 S.W.3d at 756.
Oncor argues that the court of appeals erred by relying on section 17.157 because it relates only to "billing disputes," and not to disputes involving a utility's rates, operations, or services. Oncor relies on our decision in In re Southwestern Bell Telephone , in which we relied on section 17.157 to conclude that, "[f]or billing disputes , the PUC's authority is even more comprehensive" than for other types of disputes. 235 S.W.3d at 625-26 (emphasis added). Indeed, Chapter 17 contains numerous indications that it addresses only the PUC's resolution of billing issues.[2] And the PUC
*141 itself has concluded that "the disputes that the [PUC] may resolve under PURA 17.157 are limited to those related to charges that are billed to the customer for products and services." Compl. of Centerpoint Energy, Inc. and Tex. Genco, LP Against Util. Choice LLC , PUC Docket No. 27745, Prelim. Order at 6 (Aug. 18, 2003).
On the other hand, we did not expressly hold in In re Southwestern Bell Telephone that section 17.157only addresses billing disputes, and the section itself refers more broadly to "disputes." And section 17.001 also more broadly states that chapter 17 "establish[es] retail customer protection standards and confer[s] on the [PUC] authority to adopt and enforce rules to protect retail customers from fraudulent, unfair, misleading, deceptive, or anticompetitive practices." TEX. UTIL. CODE § 17.001(b). It may be that, properly construed within the context of chapter 17, section 17.157 addresses only billing disputes, but we need not decide that issue here. Even if the section addresses all disputes, including those involving a utility's rates, operations, and services, we cannot read it to negate the broad scope of the "exclusive original jurisdiction" section 32.001 expressly grants the PUC. Reading section 17.157 together with section 32.001, we conclude that-even if section 17.157 addresses all disputes-it merely describes various actions the PUC "may" take when exercising its "exclusive original jurisdiction over the rates, operations, and services of an electric utility." Id. § 32.001(a). And by doing so, as we explained in In re Southwestern Bell Telephone , section 17.157 further underscores that PURA has established a comprehensive regulatory scheme. 235 S.W.3d at 625-26.
In light of section 32.001(a)'s express language and the comprehensive regulatory scheme PURA creates, we conclude that PURA grants the PUC exclusive jurisdiction over all matters involving an electric utility's rates, operations, and services. And because Chaparral's breach-of-contract claim in this case complains of Oncor's services, we conclude that the scope of the PUC's exclusive jurisdiction encompasses that claim. Accordingly, Chaparral was required to exhaust its administrative remedies before the PUC before seeking relief in district court.
B. The PUC's power to remedy
Chaparral argues that, even if this case would otherwise fall within the PUC's exclusive jurisdiction, the "inadequate-remedy exception" to the exhaustion-of-remedies requirement applies. The inadequate-remedy exception applies when the claimant cannot obtain an adequate remedy through the administrative process and requiring the claimant to go through the process would cause the claimant irreparable harm. See Hous. Fed'n of Teachers, Local 2415 v. Hous. Indep. Sch. Dist. , 730 S.W.2d 644, 646 (Tex. 1987). Chaparral cites a Fifth Circuit case for the proposition that when "the PUC has no power to provide the remedy sought, then, exclusive jurisdiction cannot rest in that body." Penny v. Sw. Bell Tel. Co. , 906 F.2d 183, 186 (5th Cir. 1990). And because the PUC does not have the power to award monetary damages, it argues that the PUC cannot have exclusive jurisdiction over its claim.
We conclude that the inadequate-remedy exception does not apply in this case *142 because PURA does not prevent Chaparral from obtaining the damages it seeks in the district court after the PUC has exercised its exclusive jurisdiction. We described this two-step process in David McDavid Nissan , in which we held that the former Texas Motor Vehicle Commission Code granted exclusive jurisdiction to the former Texas Motor Vehicle Board to resolve claims and issues that the Code governed. 84 S.W.3d at 217. We explained, however, that in "some instances," the "statutory scheme may necessitate that an administrative agency with exclusive jurisdiction make certain findings before a trial court may finally adjudicate a claim." Id. at 221. Under this "hybrid claims-resolution process," the agency must first exercise its exclusive jurisdiction and apply its unique expertise to resolve the issues that fall within its exclusive jurisdiction. Id. at 222, 224. The claimant must first "exhaust administrative remedies to obtain [the agency's] decision" on those issues before filing suit to obtain relief the agency cannot provide. Id. at 224. The agency's findings are "subject to substantial-evidence review" in the courts, and the claimant may rely on those findings to establish its claim and obtain relief in the courts. Id.
We agree with Oncor that the same two-step process applies to Chaparral's claim under PURA. As a PUC-regulated utility, Oncor is required to file a tariff with the PUC describing its rates, operations, and services. Id. § 32.101.[3] Once the PUC approves the tariff, Oncor must comply with the tariff's requirements and apply its rates and provide its services uniformly to all of its retail customers. Id. ; 16 TEX. ADMIN. CODE § 23.3. Oncor contends, and Chaparral does not dispute, that Chaparral's breach-of-contract claim cannot be resolved without considering and construing Oncor's PUC-approved tariff. Although the parties' Service Agreement provided only that Oncor would provide a "more definitive installation schedule," and although Oncor admits it did not provide that schedule, it contends it did not breach the agreement because various tariff provisions apply and excuse its non-compliance. In particular, Oncor's tariff:
- requires Oncor to "use reasonable diligence to comply with the operational and transactional requirements and timelines for provision of Delivery Service";
- requires the parties to "cooperate in good faith to fulfill all duties, obligations, and rights set forth in [the tariff]";
- provides that Oncor "will not be liable for any damages ... occasioned by fluctuations or interruptions" in the delivery of electricity;
- provides that, unless "mutually agreed to by [Oncor] and [its] Retail Customer," Oncor must provide an "entity requesting Construction Service an estimated completion date and an estimated cost for all charges to be assessed" within "ten Business Days of [Oncor's] receipt of a detailed request" for such information;
- describes the form of the easement Oncor is entitled to receive for the facilities it constructs; and
- states that the tariff's provisions "shall" govern all requests for construction services.
Oncor relies on these types of tariff provisions to defend against Chaparral's claim, and Chaparral relies on others to *143 support its claim. The Service Agreement, in fact, required Chaparral to pay $22,327 "[p]ursuant to" Oncor's tariff, and in its district-court petition, Chaparral sought "additional damages recoverable pursuant to Oncor's Tariff." Oncor argued in the court of appeals that the PUC has exclusive jurisdiction "because the claim's resolution requires the Tariff's interpretation." The court addressed and rejected Oncor's tariff-based arguments and defenses on their merits.[4] We express no opinion on the merits of these arguments, but we do agree with Oncor that the PUC has exclusive original jurisdiction over those issues, which relate to Oncor's operations and services. Once the PUC has exercised its jurisdiction and resolved these issues, Chaparral may seek damages in the trial court based on the PUC's findings.
We also conclude that the inadequate-remedy exception does not apply because Chaparral has not demonstrated that exhausting its administrative remedies will cause it to suffer irreparable harm. Chaparral relies on our plurality opinion in Houston Federation of Teachers in which we held that teachers subject to a new school-district policy that extended their work hours beyond the 7-½ hours of the prior policy did not have to exhaust their administrative remedies because "an award of damages months later will not provide adequate compensation" for the lost time. 730 S.W.2d at 645-46. Notably, the trial court's finding that the teachers would suffer "severe, immediate and irreparable harm" was "undisturbed" on appeal. Id. at 646. Here, Chaparral has made no attempt to describe what "severe, immediate and irreparable harm" it would suffer if forced to exhaust its administrative remedies. It seeks only monetary damages and has offered no evidence that a delay in recouping those costs would pose an undue financial burden, much less irreparable harm.
C. Chaparral's constitutional rights
Finally, we consider Chaparral's argument that requiring it to exhaust administrative remedies deprives it of its constitutional rights to a jury trial and to open courts. We disagree.
The Texas Constitution provides: "All courts shall be open, and every person for an injury done him, in his lands, goods, person or reputation, shall have remedy by due course of law." TEX. CONST. art. I, § 13. We have explained that, among other protections, this provision mandates "that the legislature may not abrogate the right to assert a well-established common law cause of action unless the reason for its action outweighs the litigants' constitutional right of redress." Trinity River Auth. v. URS Consultants, Inc. , 889 S.W.2d 259, 261 (Tex. 1994) (quoting Tex. Ass'n of Bus. v. Tex. Air Control Bd. , 852 S.W.2d 440, 448 (Tex. 1993) ). In other words, "legislative action withdrawing common-law remedies for well-established common-law causes of action for injuries to one's 'lands, goods, person or reputation' is sustained only when it is reasonable in substituting other remedies." Id. at 262 (quoting Lebohm v. City of Galveston , 154 Tex. 192, 275 S.W.2d 951, 955 (1955) ). PURA's legislative scheme, Chaparral argues, offers no reasonable substitute for its common-law breach-of-contract claim.
*144 Our Constitution also guarantees the right to a jury trial in both the Bill of Rights and the Judiciary Article. TEX. CONST. art. I, § 15 ("The right of trial by jury shall remain inviolate. The Legislature shall pass such laws as may be needed to regulate the same, and to maintain its purity and efficiency ...."), art. V, § 10 ("In the trial of all causes in the District Courts, the plaintiff or defendant shall, upon application made in open court, have the right of trial by jury ...."). The Bill of Rights "maintains a right to trial by jury for those actions, or analogous actions, tried by jury when the Constitution was adopted in 1876." Tex. Workers' Comp. Com'n v. Garcia , 893 S.W.2d 504, 526 (Tex. 1995) (citing Tex. Ass'n of Bus. , 852 S.W.2d at 450 ). The Judiciary Article "protects the right to have a jury resolve fact questions in all 'causes' brought in the district courts." Id. (citing State v. Credit Bureau of Laredo, Inc. , 530 S.W.2d 288, 292-93 (Tex. 1975) ; Tolle v. Tolle , 101 Tex. 33, 104 S.W. 1049, 1050 (1907) ). Chaparral makes two arguments on this issue: first, that PURA's regulatory scheme abrogates its pre-1876 common-law breach-of-contract suit; second, that the only avenue of judicial review of a PUC ruling is a substantial-evidence review, which is specifically defined as a review "without a jury." TEX. GOV'T CODE § 2001.175 (defining substantial-evidence review).
For over one hundred years, we have noted that "in certain types of adversary proceedings the constitutional right to a jury trial does not attach" and that included in those types of proceedings are "appeals from administrative decisions." Tex. Ass'n of Bus. , 852 S.W.2d at 450 (citing Credit Bureau of Laredo , 530 S.W.2d at 293 ). In reaching that conclusion regarding environmental regulations, we noted in Texas Association of Business that "agencies' assessments of environmental penalties are not actions, or analogous actions, to those tried to a jury at the time the constitution of 1876 was adopted." Id. at 451. We said, "To hold that these environmental statutes and regulations promulgated in the late 1960s merely parrot common law and statutory rights triable to a jury in 1876 would turn a blind eye to the emergence of the modern administrative state and its profound impact on our legal and social order." Id. Similarly here, Chaparral's breach-of-contract claim stems not merely from the Service Agreement between the parties, but from Oncor's tariff, which sets out requirements regarding Oncor's delivery of services. As Chaparral itself noted in its petition,
Oncor must use reasonable diligence to comply with the Tariff's requirements and timelines for providing delivery service.... Oncor must cooperate in good-faith [sic] with Chaparral ... to fulfill all of its duties, obligations and rights set forth in the Tariff.
....
Extending the Oncor delivery system to the point of delivery required "construction services" (as defined in the Tariff). Oncor Tariff Section 5.3.1.2 provides that Tariff Section governs construction services requests.
The aspects of Oncor's performance of which Chaparral complains are those governed by PURA and the PUC rules, neither of which is analogous to any action tried to a jury in 1876. Thus, "no right to a jury trial attaches to appeals from administrative adjudications under the ... statutes and regulations at issue here." Id. at 451.
It is also true that access to a jury need not be provided at the initial adjudication, so long as "the right to appeal and the jury trial on appeal are secured." Cockrill v. Cox , 65 Tex. 669, 674 (1886). But, Chaparral argues, by limiting judicial review to *145 the substantial-evidence standard, PURA effectively "precludes the resolution by jury of any factual disputes involved in Chaparral's breach of contract claim." Thus, we must also address "whether the Legislature has so restricted the jury's role in deciding these issues that it has transgressed the inviolate right to jury trial." Garcia , 893 S.W.2d at 528. However, the substantial-evidence standard applies only to the issues the PUC has determined. The ultimate questions of breach of contract and of damages remain within the jury's province. See David McDavid Nissan , 84 S.W.3d at 221 (noting that agency makes "certain findings before a trial court may finally adjudicate a claim"); see also Garcia , 893 S.W.2d at 527 (holding that regulatory act requiring administrative hearings "does not implicate the right to jury trial, as long as the relevant issues under the modified cause of action are decided by a jury"). We therefore hold that requiring the PUC to first make underlying determinations within its expertise before Chaparral can seek recourse through the judicial system does not deprive Chaparral of its right to a jury trial nor of its constitutional guarantee of open courts.
III.
Conclusion
When the Legislature creates a pervasive regulatory scheme, it intends for the agency with the appropriate expertise to make important determinations before the parties take their claim to the judicial system. As we explained recently:
The requirement that parties exhaust administrative remedies does not deprive parties of their legal rights. Instead, it honors the Legislature's intent that "the appropriate body adjudicates the dispute" first and thereby "ensure[s] an orderly procedure to enforce those rights." By requiring the agency to address the complaints first, the law permits the agency to apply its expertise and exercise its discretion to resolve the issue and to develop a complete factual record if the courts later get involved. A party who obtains relief through the administrative process avoids the expense and delay of litigation. And if the outcome of the administrative process leaves the party dissatisfied, it may file suit and have the courts review the agency's decision.
Clint Indep. Sch. Dist. , 487 S.W.3d at 544-45 (internal citations omitted). The Legislature enacted such a scheme in PURA. Although the heart of this case is a simple contract dispute, it necessarily involves questions of rules and regulations squarely within the PUC's purview. PURA therefore requires that parties first take their disputes to the administrative agency with the proficiency necessary to make the preliminary determinations. We reverse the court of appeals' judgment and render judgment dismissing the case for want of jurisdiction. Our dismissal is without prejudice to Chaparral's right to re-file its claim after the PUC has exercised its exclusive jurisdiction.

Chaparral did not plead a separate cause of action for negligence or gross negligence.

See, e.g. , Tex. Util. Code §§ 17.151 ("Requirements for Submitting Charges"), .152 ("Responsibilities of Billing Utility"), .153 ("Records of Disputed Charges"), .154(a) ("A billing utility shall provide notice of a customer's rights under this section in the manner prescribed by the commission."), .155 ("A billing utility shall provide a copy of records maintained under Sections 17.151(c), 17.152, and 17.154 to the commission staff on request."), .156 ("If the commission finds that a billing utility violated this subchapter, the commission may implement penalties and other enforcement actions under Chapter 15.").

All utilities must make their tariffs available to the public. 16 Tex. Admin. Code § 25.241(g). At the time of this dispute, Oncor's tariff was roughly 150 pages. Its current tariff is over two hundred pages. See Oncor Electric Delivery Company LLC Tariff for Retail Delivery Service (2017), https://www.puc.texas.gov/industry/electric/rates/Trans/oncor.pdf.

The court of appeals also concluded that this case "turns" on the "filed-rate doctrine," which "prohibits courts from awarding relief against a utility that contradicts, expands, or varies from the terms of the utility's filed tariff." 511 S.W.3d at 758. As a result, the parties address this doctrine in their briefing to this Court. We conclude that it is unnecessary for us to consider the filed-rate doctrine to determine whether the PUC has exclusive jurisdiction over Chaparral's claim in this case.